PRICE *v.* CENTER.

4-5811

Opinion delivered March 11, 1940.

*Virgil D. Willis* and *Suzanne Chalfant Lightin,* for appellants.

*Karl Greenhaw* and *Shouse & Shouse,* for appellees.

BAKER, J. This litigation had its origin in a suit filed by *Mr. Albert Price* v. *Mr. Center and Wife,* praying for a partition of certain property in Washington county, Arkansas. In an answer filed by Mr. Center, appellant, J. L. Ward, was made a party. After several amendments by plaintiffs and other like pleadings had been filed, the action was tried, and a decree was rendered in favor of Center as against Price, and in favor of Cen-

ter against Ward to recover four notes, three for $300 each and one for $189, which notes, at the time of the pleadings and trial, on account of the aggregate amount of them, including interest, were nearly always referred to as the $1,100 note or notes. The decree took these notes from the possession of appellant, Ward, and ordered them to be surrendered or be delivered to Center as the owner. From this decree affecting the said several parties, Price and Ward have appealed.

For several reasons, some of which we will state, we are not undertaking close or critical analysis of that part of the case in which Mr. Price was involved. Mr. Price was a real estate agent, acting, however, in a kind of joint enterprise with Mr. Center and Mr. Ward in the purchase of a tract of land consisting of 147 acres, in Washington county, generally known as the Purdy lands. The contracts sued on, except as they may have been changed, as alleged by the appellee, provide that Mr. Price shall have an interest amounting to one-third of the proceeds that may accrue upon the sale of these Purdy lands by Mr. Center, after paying to Mr. Center the amount of the purchase price thereof and interest thereon at 6 per cent. There has been no sale of these lands nor is there any contention that Mr. Center's money has been repaid to him, with interest, nor that Mr. Price had actually paid for a third part of the land, though he did offer a receipt purporting to show such payment. The integrity of the receipt was challenged, it being alleged that although it was a receipt for certain money and signed by Mr. Center there was added to it after it was delivered by Mr. Center the words "on 147 A." It would seem that the actual purpose of this litigation, on the part of Mr. Price against Mr. Center was not in fact a partition suit, but it was used as a means of determining title. No question has been raised as to the nature of this proceeding, and we do not feel called upon, under the conditions and circumstances to comment upon the nature of the proceedings, but think it sufficient to dispose of the matters tried upon the merits.

No good result can be realized by an extended discussion of the facts, and, whatever Mr. Price's rights were

thought by him to have been, the evidence introduced and considered by the court was conclusive of every controversy that has arisen, and there is, no doubt, in our minds that the preponderance of that evidence justified fully the court's decree as to all rights asserted by Mr. Price. This is particularly true since by his own admissions, and on account of many contradictions and impeachments, no proposition of any merit may now be discussed without a waste of time.

So the decree, insofar as it affects Mr. Price's alleged interest in the land, will have to be affirmed.

The next controversy is a most serious one. It involves the four notes which we may hereafter refer to as the $1,100 note. These notes have been switched about with a great many circumstances, most of which are pertinent in some degree as affecting the rights of the parties, yet a detailed statement of all of the several acts and conduct and relationships toward each other, would make interminable the relation of every item that enters into our ultimate conclusions. Mr. Price was an active agent in all the controversies that have arisen, taking part therein either as one of three parties joined in a mutual agreement among themselves to acquire certain property, to pay therefor with money and the notes involved, and by trading of other lands, although Mr. Price is sometimes spoken of by both Mr. Center and Mr. Ward as an agent employed to help acquire the Purdy lands and who was making a trade for Center and Ward, though for convenience the title was taken in the name of Mr. Center. Both Mr. Center and Mr. Ward had known Mr. Price for 12 or 15 years. Both had had some dealing with him prior to this ill-fated venture that has caused perhaps more hard feelings and loss of friendships than loss of property. We call attention to this fact for the reason that we give no consideration to the suggestion, if not allegation, that Mr. Ward brought and introduced Mr. Price to Mr. Center, with the insistence that Mr. Center employ him as their agent to make the contemplated deal.

Many years prior to the matter under consideration, Mr. Center, Mr. Ward and Mr. White had bought what

was known as the Moark lands. Mr. White sold his interest to Mr. Price who had acted somewhat in the nature of an agent in acquiring these lands for these three parties. Mr. Center furnished the money to Mr. Price when he bought White's interest. Later Mr. Center and Mr. Ward acquired Price's interest. It is immaterial whether Price made any money on this deal or not. He claims he had only $15 paid to him for expenses in the purchase of gasoline and other items, though Mr. Center says he paid him the $15 as a commission. These lands were then sold to Mr. Waggoner who paid a certain part of the purchase price and gave the four notes in question, referred to as the $1,100 note. These notes were payable to Mr. Center, but were owned by Mr. Ward and Mr. Center in equal shares. As we understand it, these notes represent an amount about equal to the profit made by these gentlemen on the Moark land that had been disposed of. They still owned the small quantity of the land that remained unsold.

Dr. Moore had contracted for the Purdy lands in Washington county and deed had been placed in escrow. Price first approached Dr. Moore, attempting to trade for the Purdy lands. He finally had Mr. Ward go with him, and they investigated the Purdy lands, and Mr. Ward talked about the transfer or trading of the other lands as part of the consideration for the Purdy property. The lands Mr. Ward had in mind were four hundred acres in Boone county belonging to Mr. Carter, which 400-acre tract later was brought into the controversy. Afer Ward had examined the lands, he talked with Mr. Center about it. He expressed himself to Mr. Price as favorable to the purchase of the land. Dr. Moore was to pay $3,000 for these lands and had not paid any of the purchase price, though he probably would have done so at the request of the seller at any time. He refused to consider, as the proof in this case was developed upon trial, any trade for other lands, or the notes which had been tendered to him, except that he insisted that he should be paid $3,000 in cash, which was paid, and in addition Dr. Moore insisted that there should be delivered to him title to land belonging to a Mr. Pool, the

Pool lands being adjacent to a farm owned and occupied by the doctor's daughter and son-in-law. Price made these trades. Ward did not take any part in them. Center and Ward lived neighbors at Alpena Pass. Though they frequently saw each other, Center and Price, principally Price, completed the deal with Dr. Moore. Ward did not even know the facts in relation to the deal, but relied implicitly upon the conduct of Price and Center and his confidence in both of them. It developed upon the trial in this case that two or three days before the deal was concluded and title of the Purdy lands conveyed to Mr. Center, Price met Center early one morning when he was about to leave his home, going to Springfield, and Price insisted that Center give him checks and the notes so that he might close the deal. The checks were made payable to Mr. J. T. Ward, one for $500 and one for $2,500. The notes were indorsed without recourse to blank by Mr. Center. When the notes were next seen by Mr. Center, he says there had been added in the blank space left in his assignment, the name of Lavelle Price, the daughter of Mr. Albert Price. Mr. Center's testimony was to the effect that the reason this blank space was left in the assignment was that Price told him at the time of the indorsement that he had forgotten the name and initials of the man to whom the notes were to be transferred. The original notes were exhibited upon this trial, and we have examined them, and this assignment perhaps corroborates very strongly the testimony of Mr. Center that he left a blank in the assignment. Therefore, we hold, to whatever extent that that matter is material, that Mr. Center's evidence in this respect is supported by a preponderance of the evidence. Mr. Center contends that these notes were delivered to Mr. Price, as were the checks aforesaid, to be delivered to Dr. Moore as part of the consideration for the Purdy lands. However, the particular checks executed at that time and delivered to Mr. Price and payable to Mr. Ward were never delivered to Mr. Ward and never indorsed by him and were not used in the final transaction in closing the deal for the land, and Mr. Ward's testimony in regard to these checks is that he never saw them, knew nothing of them and

had no understanding in relation to them, and his testimony in that respect is undisputed, except for the fact that he is an interested party to the litigation. A day or two later when the deed was delivered, the two checks payable to Mr. Ward were surrendered by Mr. Price, and Mr. Center issued two other checks, one for $3,000 and the other for $500. It was in that way, however, that Mr. Price acquired possession of these notes, indorsed as they were by Mr. Center to whom they were payable. The notes were taken to Harrison where they were deposited in a bank in that city after indorsement by Mr. Price, or by his daughter, Lavelle, whose name had then been written in the blank, and the sum of $275 was obtained upon these notes. It was the understanding at the time that this $3,000 was to be delivered to Dr. Moore, but Mr. Center says that Price told him on the same date that it would take $500 more to close the deal, because ''there is a second mortgage.'' Price's explanation is that he asked Mr. Center to loan $500 on the four hundred acres of Boone county land, convey same and take a mortgage back as security. Mr. Center refused to do this, but issued the check and retained title to the Boone county lands. The Boone county lands, according to Mr. Center's understanding, were to be conveyed to Dr. Moore, the owner of the Purdy lands. Mr. Center says that he did not understand or know that the Pool land had been purchased and was to be conveyed to Dr. Moore as a part of the consideration for the Purdy land. Pool, it is asserted, would not deal with Dr. Moore, so he was paid the $500 by check made payable to Ode Pool and signed by Mr. Center, to pay ''the second mortgage.'' Pool was paid the $275 borrowed from the bank at Harrison by Price upon the $1,100 notes deposited there by him and his daughter. Ode Pool and wife conveyed the Pool land to Price's daughter, who in turn reconveyed to Dr. Moore. In the statement of these details it is certainly unnecessary, if we understand all the issues, to make any comment on the fact that Price's daughter became a medium of transfer of the Pool lands or of these notes. She never had and did not acquire any actual interest in any of this property. She was only

an accommodating transferrer, or conduit of title, an agent without interest acting solely for her father, Mr. Price. We do not say that in all of the transactions or consequences that followed some of these unfortunate occurrences, there is to be ascribed to her any blame or intentional wrongdoing, or any charge of misconduct. It was perhaps the easiest way to make and transfer titles. It appears, and we think from all the facts it may be correctly inferred, that Mr. Center did not know of the purchase of the Pool lands, nor did he know that the notes which belonged to him and Mr. Ward had been taken to Harrison and money borrowed upon them, nor did he know that this borrowed money entered into the purchase of the Pool lands which were conveyed to Dr. Moore. It was his understanding that the $500 check he had issued payable to Pool was to pay off "a second mortgage."

There is no evidence that Ward had anything to do with any of these transactions. The fact that Center wrote two checks payable to Ward has been argued as against Ward's good faith in all these transactions, but appellees' attempt to bind Mr. Ward by the statements of Mr. Price, not his evidence. Certainly if Mr. Price may not be believed in his statements against Mr. Center, there is no stronger reason why he should be believed as to any statement he may have made about Mr. Ward, which statements perhaps may not be regarded as competent evidence. As an instance, we call attention to the fact that at the time Price went to Center's home and procured the issuance of these two checks, the one for $2,500 and another for $500, Mrs. Center testified that Price was in a hurry and said that Jim Ward was waiting for him. Certainly this testimony may not be regarded as a means of fixing liability upon Ward or as any evidence that he was acting in conjunction with Price in any deception practiced by Price upon Center.

We think one other circumstance should be mentioned as tending to show the relationship between Center and Price. After the deal had been completed, it seems apparent from the record that Price was attempting to secure some form of recognition from Mr.

Center that he had an interest in the property, so Price visited Mr. Center and a contract was written and dated July 14, 1937, which acknowledged that Price was to have an undivided one-third interest in this property after repayment to Mr. Center of $5,700 which amount was arbitrarily set forth in that contract as the sum of money that had been paid by Mr. Center upon the land. Mr. Center had bought some cattle and had made some improvements and other investments, but all of these did not amount to $5,700. In fact, at or about this particular time, the highest sum estimated that Mr. Center had invested in the property, was $5,100. Mr. Price was using the contract in the execution of another deal whereby he was selling one-half of his one-third interest in this property to a Mr. Bivens and his wife, and by this contract Bivens and his wife were led to believe not only by Mr. Price, but by Mr. Center who joined in this agreement, that Mr. Center had this excessive investment in the land. Bivens and wife were to have possession of the land. They delivered over to Price on the faith of this contract a note for about or nearly $400, which Price promptly negotiated. Bivens and his wife say that when they were insisting upon possession, Mr. Center advised them that Price really had no interest in the land. They then settled with Price for two street popcorn machines. Mr. Center testifies that it was his expectation that the Boone county land was also to be transferred to Dr. Moore. He was not willing to transfer the land and take the mortgage back for the $500 that he advanced to pay off the alleged second mortgage. He preferred to advance the money and hold the title to the land to be conveyed when the $500 was repaid. We think it highly probable that Mr. Center did not know the details of all these separate dealings made by Mr. Price, that there is some evidence that tends to justify a conclusion that Mr. Center was perhaps not particular in checking up and gaining information as to all the matters that Mr. Price was negotiating. He held himself in readiness to deed the Boone county land upon repayment of the $500, but at the same time he let Mr. Price sell $60 worth of timber from this land. There is no explanation as to why this

was done, but certainly if Mr. Center had understood that he was to transfer this property, as it was at the time of the trade, he should not have entered into this agreement. On the other hand, there must have been some understanding that Price had some interest in this property, otherwise permission to cut this timber would not have been granted. Later Mr. Center said Mr. Price told him Dr. Moore would not accept the Boone county land offered and repay the $500. After that Mr. Center made a settlement with Price in regard to the Boone county lands, charging him with the $60 for timber and charging up other items and then by giving a check for $45 as a balance. Mr. Price says a $500 note was surrendered to him; this was not denied except Mr. Center said, after mentioning several items, speaking of Price: "and he said he would give me back one-third interest in the 400 acres if I would give him $45; that made $223 I gave him for his interest in the wild land." So, Mr. Center and Mr. Price were dealing with each other in regard to these wild lands without formally conveying them. These were the lands Mr. Center says he believed from Price's statements were to be conveyed to Dr. Moore. They were the same that Price says he borrowed the $500 on, the note which he surrendered when he got the $45 check. These lands were to be handled or negotiated by Price, the same as the $1,100 note.

We have already shown that Mr. Price transferred this note to a bank at Harrison for $275 which entered into the purchase price of the Pool lands given as part of the purchase price for the Purdy lands. There seems to be no dispute about this matter, but it is probable that at the time of the filing of the suits this fact was not known to Mr. Center and his counsel, but it was developed by the proof, and there is no other explanation as to how the Pool lands were paid for before they were conveyed to Dr. Moore.

Sometime after this deal was closed, as it was, involving all the other negotiations above set out, Mr. Center testifies that he met Mr. Ward one day and said to him: "Do you know Albert Price beat us out of our note? He has put it up at the bank." He says that

Ward answered him and told him that Price said that he had traded in a piece of his own land in acquiring possession of the notes; that he at once assumed that Ward knew more about it than he did and said nothing else.

We think it highly probable that Mr. Center reached an unwarranted conclusion. Mr. Center's conduct in dealing with the Boone county lands indicated pretty clearly that Price was treating those lands as if he had some interest in them. Center recognized that interest. With these lands Price paid back the $500 borrowed on them to pay off the alleged "second mortgage," but used in fact to pay for the Ode Pool land. Since the Pool land was traded in on the Purdy land, Price had that much investment in those lands if not represented by the notes for $1,100. So, it may be there was some truth in his claim that he put in some lands on the notes. When Ward told Center that such was the explanation that Price had given, Center had been a party to the foregoing trades with Price, and he knew that Ward had not been. Appellee insists that under the circumstances when Center said: "Do you know that Albert Price has beat us out of our notes?," this was sufficient notice to put Ward upon guard and to prevent him from ever acquiring the notes from Albert Price. We do not think so. There had existed between these two men up until that time, as we understand the situation, the utmost confidence and friendship, and each relied and depended upon the other. If Center suspected that Ward had acted with any degree of bad faith toward him, it was then his duty to have spoken. There was at that time no evidence, and there is not any now that Ward had been connected to any extent or any degree with any of the negotiations in the purchase of the Purdy lands from Dr. Moore. He had practiced no deceit and taken no part, had risked his interest in the notes, in the hands of his friend in whom he still had the utmost confidence and who still believed in Center's honesty at the time of the trial, as he commended him highly for his fairness and integrity, though the two were perhaps then unfriendly. With that degree of confidence in Center and advising Center that Albert Price had said he had put

in some land of his own, a matter which now appears to have been the Boone county land, Mr. Ward said that he dealt with Albert Price for these notes and, no doubt, accepted Price's statement undenied by Mr. Center who then knew the facts he offered in evidence. Mr. Center had the chance or opportunity of explaining. He preferred to remain silent. Mr. Ward, no doubt, thought that Price's explanation as stated was satisfactory, because it was not denied. If this were all the record, we feel that the conclusion must necessarily be that Mr. Ward was justified in the purchase of the $1,100 notes from Albert Price, but Mr. Breck Porter, the son-in-law of Mr. Ward, and Mr. Ward also testified that Center said that he was going to try to get or buy back these notes from Albert Price because Albert was indebted to him. This statement is not contradicted by the fact that Mr. Center and Mr. Price had made a settlement, because Mr. Center says the settlement was in regard to the Boone county lands only. We see no fact or circumstance by which Mr. Ward or Mr. Porter either should be discredited or be disbelieved, or that Mr. Center should be believed rather than either or both of them. Their interests are equal in the controversy. Mr. Center admits that he was secretive, refused to talk and preferred to wait and did wait until Mr. Porter and Mr. Ward had purchased the $1,100 notes from Albert Price, relied, as they say, upon Mr. Center's indorsement and under the evidence the indorsement may be treated as one not in blank, although by close scrutiny, we think it may have determined that the assignment was made in blank to which was added by Price the name of his daughter to make her the nominal assignee, but it is highly probable to one not acquainted with all these negotiations, this would not have appeared. So if the instrument be treated as an indorsement in blank, or as indorsement to Price, Price was the man who negotiated the sale and the one to whom Mr. Center delivered the notes with his indorsement. We are perfectly well aware that there has been an argument that this was not a transfer in due course. That is perhaps true, but the maker of the instruments involved is not affected ad-

versely by the transfers, nor is it necessary that he protect himself on account of the fact that the instrument was not legally negotiated in every particular and detail. It is a question in which one of these two interested parties may be deemed at fault and must suffer loss therefor. Mr. Center admits the indorsement and delivery of the instrument. It was taken by his agent on his indorsement, negotiated at the bank and Mr. Center repaid $275, the proceeds of that negotiation. He, no doubt, learned before he made Ward a defendant that the purchase price of the Purdy lands then held by him was his check for $2,975, the Pool lands deeded to Dr. Moore, which cost the $500 check and $275 borrowed from the bank at Harrison. He admits the $500 was repaid by Price who surrendered his claim to the wild Boone county lands; and he knew from Ward that Price was claiming the notes on that account. He knew all this before the case was closed and he did not offer to refund or repay, but did testify most strongly that after this suit was over he would "still do right by Mr. Ward." If that statement means anything it indicates he was not then doing right by Mr. Ward; and we accept his own interpretation of his conduct. But he was then in a court of conscience. It was necessary that he do right at that moment, not later.

Mr. Center thought he was paying for the Purdy lands $3,000 by check, $1,100 in notes, $1,000 value in Boone county lands. From these figures we get $5,100 as the purchase price. The actual price appears to have been the check for $2,975 which we treat as $3,000, the Pool lands costing $775.

By all these trades and negotiations it definitely appears that Price, by his recognized interest in the Boone county lands, repaid the $500 note. If he had anything in that note, given for the check to pay for the fictitious second mortgage, but used to pay for the Pool lands, that interest was represented by the $1,100 notes.

This is not a suit for damages as against Mr. Ward, but a suit to recover specific property—the notes. The court gave him that specific relief. The effect of it was

to take from Mr. Ward these notes which he had bought from Albert Price, paying the bank $275. Price also got $200 from Ward. Ward's son-in-law paid $400, and released the $75 debt. Ward had released to Price the $650 debt or due bill. Center could not rightfully have recovered the $275 nor the $500, the part of the purchase price he had not paid.

We think Mr. Center is estopped by his silence at a time when he should have spoken or explained, particularly in the light of the fact that he and Ward both were suggesting a desire to purchase the notes from Albert Price in order to secure old debts, if this statement can be treated as true, and we regard it as, at least, of equal value to any other statement connected with the deal. By his indorsement Mr. Center made possible this transfer. At the time he indorsed it, it was paper that was owned jointly by himself and Ward, but he has settled with Ward for his interest in the notes so that the title to the Purdy property became his subject only to the claim of Albert Price as evidenced by the Bivens deal. When we consider the close relationship of these two men, the former dealings, the fact that there was no unfair conduct, no suspicious act on the part of Ward, we must hold that Mr. Center should have explained to Ward and not have remained silent, and now that he elected to remain silent, he may not be heard to complain. Such is the law. *Rone* v. *Sawrey,* 197 Ark. 472, 123 S. W. 2d 524; *Davis* v. *Neal,* 100 Ark. 399, 140 S. W. 278, L. R. A. 1916A, 999.

Moreover, during the 16 months that Mr. Center waited, after he had knowledge that Mr. Ward had acquired these notes, Mr. Ward entered into a binding contract with Mr. Waggener, changing his condition and his relationship to the maker of these notes—a contract that Mr. Waggener who is not a party to this suit is most probably in position to insist should be performed. This unusual and unnecessary delay under the circumstances must work an estoppel against Mr. Center to an enforcement of his alleged rights. *Katter* v. *Hardin,* 172 Ark. 268, 288 S. W. 881; *Fleming* v. *Harris,* 142 Ark. 553, 219 S. W. 33.

For the reason that lands were involved in this controversy, the title to which might later sometime be questioned in some particulars, if the litigation be not disposed of, in the county where the lands are located, the action is reversed with directions to enter a decree giving Mr. Ward the four notes in controversy. The only matter not disposed of from which could arise any argument upon this reversal is the fact that Mr. Ward sued for the penalty on account of Mr. Center's refusal to satisfy the lien or mortgage securing these notes. Courts of equity do not hesitate to enforce statutory penalties; but in this case there is no actual damage or loss established justifying the same. The penalty is not in a fixed sum. Section 9453, Pope's Digest. So, the court is directed to declare by proper decree the transfer of the lien securing these notes, or the satisfaction thereof, which ever course appellant Ward and his counsel may be advised to pursue, and no penalty may be exacted unless and until there is proof of actual loss to justify allowance made.